IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-62

No. 141PA20

Filed 6 May 2022

THE CHERRY COMMUNITY ORGANIZATION, a North Carolina non-profit corporation, and STONEHUNT, LLC

v.

STONEY D. SELLARS, MIDTOWN AREA PARTNERS HOLDINGS, LLC, and MIDTOWN AREA PARTNERS II, LLC

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished opinion of the Court of Appeals, No. COA19-695, 2020 WL 774020 (N.C. Ct. App. Feb. 18, 2020), affirming a judgment entered on 31 December 2018 by Judge Eric L. Levinson in Superior Court, Mecklenburg County. Heard in the Supreme Court on 4 October 2021.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Scott A. Miskimon, Kerry A. Shad, and J. Mitchell Armbruster, for plaintiff-appellant Cherry Community Organization.*

*Alexander Ricks PLLC, by Roy H. Michaux Jr. and Matthew T. Houston, for defendant-appellees Midtown Area Partners Holdings, LLC and Midtown Area Partners II, LLC.*

MORGAN, Justice.

¶ 1 This Court allowed plaintiff's Petition for Discretionary Review in order to examine a unanimous opinion of the Court of Appeals which affirmed a trial court's judgment dismissing plaintiff's lawsuit which lodged claims against defendants

under North Carolina's Uniform Voidable Transactions Act (UVTA). The trial court concluded, and the Court of Appeals agreed, that defendants were good faith purchasers for value and thus possessed a legitimate defense against plaintiff's claims under the UVTA. However, the trial court's unchallenged findings of fact require the application of common law agency principles which operate to remove the protection of the good faith purchaser defense from defendants. Therefore, the decision of the Court of Appeals is reversed in part, and the judgment of the Superior Court, Mecklenburg County, entered on 31 December 2018 in which it dismissed plaintiff's UVTA claims against defendants is vacated and this case remanded for further proceedings in accordance with this opinion.

## I. Factual and Procedural Background

Plaintiff The Cherry Community Organization is a North Carolina nonprofit entity dedicated to the preservation and enhancement of an area of Charlotte known as Cherry, a historic Black, working-class neighborhood near the city's uptown district. Plaintiff organization is comprised of occupants of properties within the Cherry community and leases affordable housing units which plaintiff owns to low-income, disabled, and senior residents, some of whom have lived there for generations. In furtherance of this mission, plaintiff began contracting with an individual named Stoney Sellars and his real estate development company StoneHunt, LLC in 2004 in order to develop affordable housing units on several acres

of land which plaintiff owned in the Cherry neighborhood. Under the ensuing contracts, StoneHunt obtained title to eight acres of prime real estate owned by plaintiff near the center of Charlotte at below-market rates in exchange for a promise that StoneHunt would develop certain parcels of the land into housing units for low-income, disabled, and senior occupants. However, StoneHunt failed to build all of the affordable housing units which it pledged, instead maneuvering to sell most of the land conveyed to StoneHunt by plaintiff under the contract to market-rate residential builders in May 2014 for an enormous profit. Of the land conveyed to StoneHunt by plaintiff under the original contract, StoneHunt retained only a half-acre parcel. Adjacent to this half-acre parcel was another quarter-acre parcel which StoneHunt also owned but that was otherwise unrelated to StoneHunt's unfulfilled contractual obligations to plaintiff. Together, these two parcels are identified in this matter as the "subject property."

¶ 3        Defendants Midtown Area Partners Holdings, LLC and Midtown Area Partners II, LLC (MAP) are real estate development businesses which share identical ownership. Defendants' principals are sophisticated, informed real property and financial investment professionals who have heightened knowledge about the marketplace and land values.[1] One of defendants' principals approached Sellars twice

---

[1] In addressing this case in a manner to promote clarity, the term "defendants" collectively refers to the two MAP entities which are named parties in this action as well as their respective principals who are identical, yet unnamed in the underlying lawsuit.

during the 2012–2013 time period in order to probe StoneHunt's willingness to sell the subject property to MAP. Defendants' representative explained that MAP owned adjacent parcels to the subject property and remarked that it did not appear that StoneHunt was in the process of developing the land at issue despite a sign from 2008 which was situated on the property stating, "Town Homes Coming." Sellars denied the occurrence of such overtures. Defendants' agent then proposed that StoneHunt and MAP work together in developing the subject property which StoneHunt controlled and the adjacent parcels that defendants owned. The two entities, through their respective actors, entered into an operating agreement to develop these contiguous properties into a $50 million mixed-use project in March 2014. Extending from the creation of this arrangement until its termination, defendants and StoneHunt were the principals of a general partnership engaged in a joint venture for the development of the mixed-use project, with defendants enjoying an insider status to StoneHunt's dealings with the subject property.

¶ 4    Having discovered StoneHunt's breach of its contract with plaintiff to construct the affordable housing units in a collaborative approach on the acreage conveyed by plaintiff to StoneHunt in the 2004 conveyance, plaintiff filed suit against StoneHunt and its principal Sellars on 10 September 2015 for breach of contract and violations of the North Carolina Unfair and Deceptive Trade Practices Act (the first lawsuit). The first lawsuit sought monetary damages and the recovery of title to the portion of

the subject property which plaintiff had deeded to StoneHunt under the 2004 contract and was accompanied by a Notice of Lis Pendens that was filed in the county clerk's office the same day concerning this part of the subject property. Plaintiff delivered copies of the complaint and Notice of Lis Pendens simultaneously to defendants' attorney. Defendants contemplated the potential effects which the first lawsuit could have on the viability of the joint project of defendants and StoneHunt, leading to communications with Sellars and StoneHunt about the authority of plaintiff's board members to prosecute the first lawsuit, StoneHunt's legal strategy in countering plaintiff's claims, and the financial impact on defendants' and StoneHunt's joint venture as a result of the Notice of Lis Pendens. Defendants were not involved otherwise with StoneHunt's defense of the first lawsuit. The first lawsuit was dismissed in February 2016 by order of the trial court pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and the Notice of Lis Pendens was cancelled by another order of the trial court in May 2016. Plaintiff timely appealed the trial court's orders which, taken together, effectively halted the first lawsuit.

¶ 5        During the pendency of plaintiff's appeal to the Court of Appeals and at the behest of StoneHunt, one of defendants' principals submitted to the lower appellate court an affidavit in opposition to plaintiff's appeal, lamenting that the development of the subject property would "be delayed and thus damaged by a cloud on the title to two of the StoneHunt parcels" due to the Notice of Lis Pendens filed by plaintiff. On

17 June 2016—approximately one week after the affidavit—plaintiff's counsel sent a letter to defendants' counsel which expressed confidence that the Court of Appeals would reverse the trial court's dismissal of the first lawsuit and the trial court's cancellation of the Notice of Lis Pendens, and reminded defendants that litigation against StoneHunt was still pending, thus putting title to the subject property "at issue." The letter concluded with an admonition from plaintiff's counsel that if StoneHunt and defendants continued with plans to develop or convey the subject property, they did so "strictly at their own risk and peril." A few months later, in September 2016, although StoneHunt had represented the subject property to be worth $2.5 million, nevertheless the real estate development company offered to sell the subject property to defendants outright for $1.1 million. Sellars explained that this sudden shift in his company StoneHunt's involvement with the subject property and the accompanying mixed-use project was inspired by Sellars's desire to spend more time looking after his family and growing information technology business, even though Sellars's continued involvement with the multi-use development would have yielded far greater monies than a direct sale to defendants without any substantial work on Sellars's part. The following week, notwithstanding defendants' belief that the value of the subject property rested somewhere between $600,000 and $800,000, defendants orally agreed to purchase the subject property for StoneHunt's offering price of $1.1 million but on different terms than those offered by StoneHunt.

¶ 6          In late October 2016, plaintiff's counsel sent defendants' counsel a calculation of damages totaling $1,694,000 which plaintiff reasonably expected to obtain in an eventual judgment against StoneHunt—not including interest, attorney's fees, and potential treble damages—in the event that plaintiff prevailed in its lawsuit. The oral arguments in plaintiff's appeal were presented in the Court of Appeals on 28 November 2016. On the following day, in recognizing that the Court of Appeals would possibly issue an opinion in favor of plaintiff and potentially reinstate the first lawsuit, StoneHunt's counsel sent an electronic mail to defendants explaining that they should expect the Court of Appeals decision "fairly quickly" and advising "everyone to try to get this done as soon as possible," referring to the completion of the sale of the subject property which had yet to be reduced to writing.

¶ 7          Based upon a mutual trust established through the parties' relationship as business partners, StoneHunt and defendants agreed to fully conceal their pending land transaction until it was too late for plaintiff to attempt to prevent the sale. Instead of placing the subject property on the open market, StoneHunt and defendants agreed to an insider sale, wherein the availability of the subject property to be purchased from StoneHunt would not be publicized and defendants' knowledge of the land's availability for purchase was due to their special relationship with StoneHunt. There was no appraisal of the land's value which was performed, and the parties did not negotiate about the transaction price. On 8 December 2016—nine days

after the electronic mail correspondence which StoneHunt's counsel sent to defendants which advised that the subject property transfer needed to be "done as soon as possible" lest an unfavorable ruling from the Court of Appeals on plaintiff's appeal of the first lawsuit erect a formidable barrier to the ability to consummate the land transaction involving the subject property—StoneHunt and defendants signed a contract for the sale of the subject property (the purchase contract) through their respective agents, with Sellars executing the contract on StoneHunt's behalf. The purchase contract included a provision that, because of certain circumstances, defendants were "not willing to pay full market value" for the subject property. After multiple amendments, the final terms of the purchase contract provided that StoneHunt would disclose to defendants any filings which it already had, or would receive, from plaintiff in the continuing first lawsuit, and that the joint venture between StoneHunt and defendants would be dissolved contemporaneous with the delivery of a deed to the subject property by StoneHunt to defendants. The purchase contract further provided that, in light of the first lawsuit, and in order to encourage the resolution of the "differences" between plaintiff and StoneHunt, defendants would pay $200,000 of the purchase price at closing and issue a promissory note for the remaining $900,000 which would be payable one year later. There was also a "gentlemen's agreement" between defendants and StoneHunt that there would be a "principal pay down" of $200,000 against the $900,000 promissory note upon a

dismissal of plaintiff's *lis pendens* appeal. This term was excluded from the written purchase contract because defendants' counsel feared that it would be discoverable and defendants "didn't want to get caught up in the litigation."

¶ 8 On 30 December 2016, the Court of Appeals issued an opinion reversing the trial court's dismissal of plaintiff's first lawsuit for StoneHunt's alleged breach of contract and alleged violation of the Unfair or Deceptive Trade Practices Act (UDTPA). Having reinstated plaintiff's first lawsuit, the Court of Appeals dismissed plaintiff's appeal of the trial court's cancellation of the Notice of Lis Pendens as interlocutory. Therefore, as of January 2017, defendants knew that plaintiff's first lawsuit had been revived, defendants and StoneHunt had not yet consummated the proposed conveyance of the subject property, and the Notice of Lis Pendens clouding a portion of the subject property had not been reinstated. Irrespective of these circumstances, on 2 February 2017, StoneHunt and defendants formally closed their real estate transaction, with StoneHunt signing and delivering a deed to defendants which transferred ownership of the subject property to defendants in exchange for the $200,000 down payment and the $900,000 promissory note. On the same day the transaction closed, StoneHunt and defendants signed an agreement which dissolved the joint venture between them. StoneHunt then divided the $200,000 which it received at closing between StoneHunt's counsel for outstanding legal fees and Sellars for an amount owed by StoneHunt to him, leaving the $900,000 promissory

note and a small amount of funds as StoneHunt's sole remaining assets.

¶ 9        Upon learning of the insider sale of the subject property from StoneHunt to defendants, plaintiff initiated legal action against defendants on 30 August 2017 seeking, among other things, avoidance of the transfer of the subject property and the accompanying sale proceeds, as well as a judgment against defendants in the amount of the value of the subject property at the time of its transfer by StoneHunt for defendants' alleged violation of the UVTA[2] (the second lawsuit). *See* N.C.G.S. §§ 39-23.1 to 39-23.12 (2021). While taking the position that StoneHunt had transferred title to the subject property to defendants in an effort to defraud plaintiff of an opportunity to reach this asset as a creditor, plaintiff asserted in its complaint that defendants were not good faith purchasers for value of the subject property, and therefore defendants could not claim the protection of the UVTA which is afforded to good faith transferees. Following a lengthy jury trial in the first lawsuit which resulted in a verdict for plaintiff, StoneHunt and plaintiff entered into a consent judgment by which plaintiff would be entitled to recover from StoneHunt's bankruptcy estate over $7 million in damages, interest, and attorney's fees.[3]

---

[2] Prior to 1 October 2015, the UVTA was known as the Uniform Fraudulent Transfer Act and is mentioned as the Uniform Fraudulent Transfer Act in plaintiff's verified complaint despite the complaint being filed subsequent to the law's name change. *See* N.C.G.S. § 39-23.12 (2021).

[3] StoneHunt filed for Chapter 11 bankruptcy in the Western District of North Carolina on 29 August 2018.

¶ 10        On 21 May 2018, almost nine months after the filing of the original complaint, plaintiff filed a motion to amend its complaint against defendant Midtown Area Partners Holdings, LLC in order to add a claim under the UDTPA found in Chapter 75 of the North Carolina General Statutes. Concurrently, plaintiff amended its complaint against defendant Midtown Area Partners II, LLC as a matter of right to include a claim under the UDTPA. The trial court denied plaintiff's motion to amend its complaint against Midtown Area Partners Holdings, LLC on 19 July 2018, concluding that there had "been undue delay with respect to pursuing this claim." A nine-day bench trial in plaintiff's second lawsuit concluded on 30 July 2018.

¶ 11        The trial court entered a judgment dismissing plaintiff's second lawsuit, including plaintiff's UVTA claims against both defendant's and plaintiff's singular UDTPA claim against Midtown Area Partners II, LLC, on 31 December 2018. In its judgment, the trial court included extensive, expansive findings of fact and conclusions of law which detailed a calculated scheme by Sellars and StoneHunt to fraudulently liquidate the subject property and to hide the monetary proceeds from legitimate creditors. Despite its express recognition of the width and depth of StoneHunt's fraud, the trial court nonetheless concluded that defendants "acted in a commercially reasonable manner" in their acquisition of the property and "did not engage in fraudulent activities." The trial court further concluded that defendants had "established and met its burden of proof to show that it was a good faith

purchaser of the Subject Property,"[4] and lamented that its decision and its designation of defendants as good faith purchasers would likely leave plaintiff with little recourse in collecting the $7 million owed by StoneHunt to plaintiff for StoneHunt's breach of their 2004 contract. The trial court dismissed plaintiff's second lawsuit with prejudice and declared that the Notice of Lis Pendens was ineffectual. Plaintiff timely filed its notice of appeal from the trial court's judgment of 31 December 2018.

¶ 12      The Court of Appeals issued a unanimous, unpublished opinion affirming the trial court's dismissal of plaintiff's second lawsuit against defendants on 18 February 2020. *Cherry Cmty. Org. v. Sellars*, No. COA19-695, 2020 WL 774020, at *1 (N.C. Ct. App. Feb. 18, 2020). Plaintiff petitioned this Court for discretionary review of the Court of Appeals decision. We allowed plaintiff's petition for discretionary review on 15 December 2020.

## II.    Analysis

¶ 13      Plaintiff's request for this Court's exercise of discretionary review asks us to determine whether the trial court and the Court of Appeals committed an error of law in concluding that defendants were good faith purchasers for value where defendants

---

[4] As noted in the opinion of the Court of Appeals in this case, and as further discussed below, the trial court's conclusion to the effect that defendants were good faith purchasers of the subject property would typically be treated as a finding of fact instead of a conclusion of law, which would in turn alter the standard of review which is normally applicable to such a determination. *Bledsole v. Johnson*, 357 N.C. 133, 138 (2003). However, the legal standard by which the trial court reaches this finding remains a question of law. *Id.*

were co-principals in a joint real estate development venture with a party which intended to defraud creditors by way of the party's insider conveyance to defendants of the real estate property at issue. We conclude that defendants were imputed with the knowledge of their co-principal's fraudulent intent by virtue of the principal-agent relationship which existed between the parties pursuant to common law. Therefore, the Court of Appeals erred in affirming the trial court's determination that defendants were good faith purchasers of the subject property.

## A. Standard of Review

¶ 14     "A trial court's unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." *Cape Fear River Watch v. N.C. Env't Mgmt. Comm'n*, 368 N.C. 92, 99 (2015) (extraneity omitted). Otherwise, a trial court's findings of fact are conclusive on appeal if supported by any competent evidence. *E. Carolina Reg'l Hous. Auth. v. Loftin*, 369 N.C. 8, 11 (2016). "Whether a party has acted in good faith is a question of fact for the trier of fact, but the standard by which the party's conduct is to be measured is one of law." *Bledsole v. Johnson*, 357 N.C. 133, 138 (2003) (citation omitted). Questions of law are reviewed de novo, and "[w]hen considering a case on discretionary review from the Court of Appeals, we review the decision for errors of law." *Irving v. Charlotte-Mecklenburg Bd. of Educ.*, 368 N.C. 609, 611 (2016).

## B. The Uniform Voidable Transactions Act, the Good Faith Defense, and Imputation of Knowledge Under Agency Principles

¶ 15      The UVTA "was not designed to permit those dealing in the commercial world to obtain rights by an absence of inquiry under circumstances amounting to an intentional closing of the eyes and mind to defects in or defenses to the transaction." *Branch Banking & Tr. Co. v. Gill*, 293 N.C. 164, 189 (1977). Instead, the UVTA renders "voidable as to a creditor" any "transfer made or obligation incurred" when that transfer—in this case, the conveyance of the subject property—is consummated by a debtor with the "intent to . . . defraud any creditor of the debtor." N.C.G.S. § 39-23.4(a) (2021). In the present case, it is worthy of note that a creditor who is successful in a UVTA claim may obtain avoidance of the transfer of the real property to the extent necessary to satisfy the creditor's claim and may recover judgment for the value of the asset transferred against "[t]he first transferee of the asset" or "[a]n immediate or mediate transferee of the first transferee." N.C.G.S. §§ 39-23.7(a)(1), 39-23.8(b)(2) (2021). However, N.C.G.S. § 39-23.8(a) establishes that a transfer—such as one made by the debtor with the intent to defraud any creditor of the debtor—is not voidable against a transferee "that took in good faith and for a reasonably equivalent value given the debtor." N.C.G.S. § 39-23.8(a). Parties such as defendants in the instant case which rely upon this statutory protection afforded to qualifying transferees have the burden of proving the applicability of N.C.G.S. § 39-23.8(a) by a preponderance of the evidence. N.C.G.S. § 39-23.8(g)(1), (h).

¶ 16      Here, defendants were charged with the burden to prove in plaintiff's second

lawsuit against them that defendants both (1) took title to the subject property in good faith from StoneHunt, which was defendants' co-principal in the joint real estate development venture, *and* (2) bought the subject property for a reasonably equivalent value which it gave to the debtor StoneHunt. While the trial court made some findings of fact which were unchallenged on appeal and hence are binding on this Court, and made still other findings of fact that are deemed conclusive for our review because they are supported by competent evidence, nonetheless the trial court was remiss in failing in its conclusions of law to consider the imputation of knowledge to defendants of StoneHunt's fraudulent conduct in StoneHunt's cunning tactic, as plaintiff's debtor, in manipulatively conveying title to the acres of the subject property which were owned by plaintiff to defendants in an effort to prevent StoneHunt's creditors from satisfying a potential judgment through acquisition of the subject property themselves. In applying the statutory law and the pertinent case law to the current matter, we determine that the facts and circumstances here, when viewed as a whole, lead to the imputation of knowledge on the part of defendants that their business partner StoneHunt had engaged in fraudulent activity by obfuscating plaintiff's access to the subject property which StoneHunt had finagled from the sole ownership of plaintiff years ago. Consequently, defendants did not meet their burden of proof to show that they were a good faith purchaser of the subject property and that they paid a reasonably equivalent value for the land. In deciding as a conclusion of law that

defendants met this statutory burden of proof, the trial court erred; subsequently, the Court of Appeals erred in affirming the trial court's judgment. We now reverse this outcome.

¶ 17        Fundamentally, the doctrine of imputed knowledge establishes the rule that "a principal is deemed to know facts known to his or her agent if they are within the scope of the agent's duties to the principal, unless the agent has acted adversely to the principal." *Doctrine of Imputed Knowledge*, Black's Law Dictionary (11th ed. 2019). Under this common law doctrine, a party is charged with knowledge attributed to a given person, especially because of the person's legal responsibility for another's conduct. *Imputed Knowledge*, Black's Law Dictionary (11th ed. 2019). As the Supreme Court of the United States stated in *Curtis, Collins & Holbrook Co. v. United States*, 262 U.S. 215, 222–23 (1923), "[t]he general rule is that a principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business." In North Carolina, "[e]very partner is an agent of the partnership for the purpose of its business." N.C.G.S. § 59-39(a) (2021). The creation of a business partnership "constitut[es] each member an agent of the others in matters appertaining to the partnership and within the scope of its business." *Rothrock v. Naylor*, 223 N.C. 782, 786 (1944).

¶ 18        In the case before us, defendants and StoneHunt were business partners engaged in a joint venture to develop the subject property by erecting a mixed-use

project. As co-principals in this capitalistic endeavor, both parties in this real estate development were recognized as agents for one another—in the statutory law under N.C.G.S. § 59-39(a) and the case law under *Rothrock*—in matters which involved the purpose and scope of the business partnership. A representative of defendants expressly proposed to StoneHunt's Sellars that StoneHunt and defendants combine their respective resources to build the mixed-use project on the adjoining lands of the subject property—in which StoneHunt held control—and neighboring parcels—in which defendants held control. StoneHunt's subsequent relinquishment of the subject property was in furtherance of the purpose and scope of its business partnership with defendants. Pursuant to the principles of this state's statutory law regarding elements of partnership and of the doctrine of imputed knowledge, fortified by the aforementioned declaration of the nation's highest court in *Curtis, Collins & Holbrook Co.*, defendants are charged with the knowledge of StoneHunt's fraudulent relinquishment of title to the subject property, as defendants are deemed to know the facts which are known by StoneHunt regarding StoneHunt's desire to convey the subject property prior to the subject property being reached by plaintiff, in its capacity as StoneHunt's creditor, to satisfy plaintiff's $7 million judgment against StoneHunt. While the doctrine of imputed knowledge does not apply in the event that an agent acts adversely to the principal's interests, which the Supreme Court of the United States amplified in a circumstance known as the "adverse interest" exception when

the highest forum opined in *Curtis, Collins & Holbrook Co.* that the doctrine does not apply "when the agent's attitude is one adverse in interest to that of the principal, because of which it cannot be inferred that the agent would communicate the facts against his own interest to his principal," *Curtis, Collins & Holbrook Co.*, 262 U.S. at 223, there is no evidence in the record, nor any legal argument advanced by defendants, that an adverse interest between StoneHunt and defendants existed regarding their business partnership to develop the subject property in general, or StoneHunt's dishonest acquisition of the title to the subject property and StoneHunt's later fraudulent conveyance of the subject property to defendants in particular. Therefore, the application of the doctrine of imputed knowledge, in conjunction with the applicable statutory law and case law, remains intact to apply to defendants' awareness of StoneHunt's fraudulent actions in obtaining title to the subject property which was originally owned by plaintiff.

¶ 19      In the federal case of *Chrysler Credit Corporation v. Burton*, 599 F. Supp. 1313 (M.D.N.C. 1984), a creditor filed a complaint against its debtor and others in an effort to have the trial court to set aside two conveyances of real estate used as business property because the title transfers were fraudulently made by the debtor. The debtor "retained substantially no assets" at the time that the property was conveyed because "the piece of land was his principal asset." *Chrysler Credit Corp.*, 599 F. Supp. at 1316. The federal district court, in exercising jurisdiction in this matter, applied

North Carolina's fraudulent conveyance law in reaching its determination. *See id.* at 1317. The trial court began its analysis by noting: "In a diversity case the Court enforcing state enacted rights must apply the law of North Carolina as declared by its legislature in a statute or by the North Carolina Supreme Court in a decision." *Id.* at 1316.

¶ 20        In recognizing that "North Carolina fraudulent conveyance law has as its cornerstone the venerable case of *Aman v. Walker*, 165 N.C. 224, 81 S.E. 162 (1914)," the federal district court stated that "[a]ccording to *Aman* when a conveyance is made by a debtor for valuable consideration, it is fraudulent and may be set aside only when the conveyance was (1) made with the intent to defraud creditors and (2) the grantee either participated in the intent or *had notice of it.*" *Id.* at 1317 (emphasis added) (quoting *Edwards v. Nw. Bank*, 39 N.C. App. 261, 269 (1979)). After citing this Court's decision in *Arrington v. Arrington*, 114 N.C. 151 (1894), as the source for the pronouncement that "[e]ither actual or constructive notice of the grantor's fraud is sufficient to deny protected status to a grantee[,]" *id.*, the trial court went on to determine the "conveyance to be a fraudulent conveyance and therefore invalid as to creditors." *Id.* at 1321. In "[c]laiming protection under North Carolina registration law," a third-party banking institution's deed of trust was deemed by the trial court to be "protected from avoidance under fraudulent conveyance law." *Id.* at 1319.

¶ 21        While not dispositive of the outcome of the instant case's presentation of the

fundamentally identical issues raised in *Chrysler Credit Corporation*, nonetheless the federal district court's discussion and application of our case law decisions regarding their impact upon a debtor's fraudulent acts regarding title to real property, the debtor's significant reduction in assets after the fraudulent acts which occasioned the conveyance, the state trial court's ability to set aside a real property conveyance which was marked by fraud, and the status of the grantee of the real property as a protected good faith purchaser is highly instructive and persuasive in our analysis of this matter. The federal district court's observation in *Chrysler Credit Corporation* that the "[p]laintiff retained . . . considerably less [assets] than the requirement that sufficient assets be retained" in leading to the tribunal's view that "no lender would extend credit for the amount of the existing debt with such security as the assets the defendant . . . retained[,]" *id.* at 1320, is germane to our evaluation of the factor in the present case wherein StoneHunt had divested itself of its chief financial asset in the form of the subject property in the event that plaintiff, as StoneHunt's creditor, was successful in plaintiff's lawsuit against StoneHunt. Likewise, the federal district court's conclusion that the grantee of the land conveyance had notice of the grantor's fraud so as to negate the grantee's protected status and to invalidate the conveyance as to creditors is pertinent to our assessment of the situation in the present case wherein defendants claim to possess protected status as the grantee of their joint venture business partner StoneHunt's conveyance of the subject property in the face

of the pending claims against StoneHunt by plaintiff as StoneHunt's creditor.

### C. Consideration of Subsection 39-23.4(b) of the General Statutes of North Carolina

¶ 22 Our determination that the trial court erred in its conclusions of law, and subsequently that the Court of Appeals erred in affirming the trial court's judgment which resulted from these conclusions of law, is buttressed by this Court's examination of the factors which are delineated in N.C.G.S. § 39-23.4(b). While referenced earlier, N.C.G.S. § 39-23.4(a)(1) reads in its entirety as follows:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) With intent to hinder, delay, or defraud any creditor of the debtor . . . .

N.C.G.S. § 39-23.4(a) (2021).

¶ 23 As a preface to identifying thirteen factors to which, "[i]n determining intent under subdivision (a)(1) of this section, consideration may be given, among other factors[,]" N.C.G.S. § 39-23.4(b) lists these circumstances to be utilizable as potentially helpful guidelines. The words employed in this statutory introduction to the factors indicate that they are not intended to be mandatory nor exclusive. In examining these factors, this Court recognizes that it must refrain, as previously stated, from disturbing any of the trial court's findings of fact which are unchallenged as well as those which are supported by any competent evidence. This Court is also

aware of the standard espoused in *Shepard v. Bonita Vista Properties, L.P.*, 191 N.C. App. 614 (2008), *aff'd per curiam*, 363 N.C. 252 (2009), with which we reiterate our agreement that "[w]hen the trial court sits without a jury, as it did in this case, 'the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." 191 N.C. App. at 616.

¶ 24    While honoring these limitations upon appellate review, we still identify the existence of six of the thirteen factors[5] upon our de novo review of the Court of Appeals decision for errors of law which it committed upon affirming the trial court's judgment, which included the trial court's failure to address in its conclusions of law the matter of the imputation of knowledge to defendants of StoneHunt's fraudulent conduct regarding the conveyance of the subject property to defendants which had belonged to plaintiff. We conclude that the imputation of knowledge to defendants of those facts which were known to StoneHunt at the time of the conveyance operates to defeat defendants' claim that it was a good faith purchaser for value of the land at

---

[5] Of the thirteen statutory factors, only eleven of them were in position to be actively considered. Firstly, the factor contained in N.C.G.S. § 39-23.4(b)(11), "The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor" is preempted by the utilization of N.C.G.S. § 39-23.4(b)(1) because the conveyance at issue was directly from StoneHunt to defendants, rather than from StoneHunt to another party which, in turn, transferred the land to defendants. Secondly, the factor addressed in N.C.G.S. § 39-23.4(b)(13), "The debtor transferred the assets in the course of legitimate estate or tax planning" is not relevant, with the subject matter of real estate constituting the focus here.

issue.

Upon our review, this Court considers the following statutory factors expressly mentioned in N.C.G.S. § 39-23.4(b) to be invoked with regard to StoneHunt's intent to defraud plaintiff, in plaintiff's capacity as a creditor of its debtor StoneHunt, so as to render voidable, as to the creditor plaintiff, its debtor StoneHunt's transfer of title to the subject property to defendants because defendants are deemed to be imputed with the knowledge of their business partner StoneHunt that StoneHunt's transfer of title to defendants was made with the intent to defraud plaintiff.

### 1. *Subsection (b)(1): The transfer or obligation was to an insider.*

Collectively, defendants, as the grantee of the subject property, were insiders of StoneHunt when the transfer of title was made to defendants.

### 2. *Subsection (b)(3): The transfer or obligation was disclosed or concealed.*

StoneHunt concealed its sale of the subject property to defendants. StoneHunt did not disclose to plaintiff the sale of the subject property until after defendants took title to the land. The concealment was instituted by StoneHunt at a time when plaintiff's claims against StoneHunt in the first lawsuit were reinstated by the Court of Appeals. StoneHunt's eventual disclosure to plaintiff of the transfer was performed in order for StoneHunt to gain an advantage in the reactivated litigation.

### 3. *Subsection (b)(4): Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.*

¶ 28 Plaintiff filed the first lawsuit against StoneHunt on 10 September 2015. The transfer of title to the subject property was made by StoneHunt to defendants on 2 February 2017. Plaintiff's appeal of the dismissal of the first lawsuit was pending at the time of the negotiation, and the Court of Appeals opinion which reversed the dismissal of plaintiff's lawsuit against StoneHunt and reinstated the action was issued on 30 December 2016, more than a month prior to the transaction's consummation.

### 4. *Subsection (b)(5): The transfer was of substantially all the debtor's assets.*

¶ 29 The subject property which StoneHunt transferred to defendants was the real estate development company's sole remaining real estate asset at the time, and StoneHunt only had a small amount of cash on hand. With the exception of the cash and the $900,000 promissory note which defendants issued to StoneHunt which became due one year from its creation, StoneHunt had a weak financial condition and no remaining assets. The subject property was StoneHunt's last substantial asset before plaintiff's claims were reinstated.

### 5. *Subsection (b)(8): The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.*

¶ 30 StoneHunt's agent, Sellars, proposed that defendants purchase the subject property for $1.1 million, which was significantly less than half of the $2.5 million value of the land that agent Sellars represented as the land's worth.

### 6. *Subsection (b)(9): The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.*

Subsequent to the debtor StoneHunt's transfer of the title to the subject property to defendants on 2 February 2017 which left StoneHunt with only a small amount of cash money and a $900,000 promissory note as StoneHunt's remaining assets, StoneHunt filed for bankruptcy on 29 August 2018. StoneHunt had not been able to pay its bills as they became due, and very soon after StoneHunt transferred the subject property, a fair evaluation of StoneHunt's debts exceeded the value of its assets. In coupling our assessment of the presence and persuasiveness of these statutory factors enumerated in N.C.G.S. § 39-23.4(b) with additional non-statutory factors which we find existent and enlightening in the present case concerning the determination of StoneHunt's intent to defraud its creditor—here, plaintiff—under N.C.G.S. § 39-23.4(a)(1) and the imputation of knowledge of the facts as StoneHunt knew them at the time of StoneHunt's implementation of the debtor's intent, such as (1) the lack of the obtainment of a formal appraisal prior to defendants' purchase of the subject property from StoneHunt, (2) defendants' ready agreement to StoneHunt's proposed sales price of the subject property without any material negotiation, (3) defendants' willingness to accommodate StoneHunt's desire for an expeditious transfer of the land's title in light of the prospect of a Court of Appeals decision reinstating plaintiff's claims against StoneHunt after StoneHunt's unequivocal e-mails to defendants' agents that the Court of Appeals "may have a

decision fairly quickly" on plaintiff's appeal and therefore it was advisable "to try to get this [subject property sale] done as soon as possible[,]" (4) the fact that StoneHunt and defendants dissolved their joint venture to develop the subject property on the same day—2 February 2017—that defendants obtained title to the subject property from StoneHunt, (5) StoneHunt's favoritism of defendants to the detriment of plaintiff, and (6) StoneHunt's preference to sell the subject property to defendants outright rather than to contribute the land to their joint venture so that the subject property would not have been an ownership asset of StoneHunt that would be available to creditors such as plaintiff and to prevent plaintiff from collecting anything on a judgment, we determine that these non-statutory factors are consistent with the emblematic statutory factors found in N.C.G.S. § 39-23.4(b) to establish that the transfer of land by StoneHunt to defendants which was fraudulently performed is voidable as to plaintiff in plaintiff's capacity as StoneHunt's creditor, because as a debtor—and as expressly determined by the trial court—StoneHunt made the transfer with the intent to defraud plaintiff in plaintiff's role as StoneHunt's creditor. In recognizing the binding nature of these extensive and comprehensive findings of fact by the trial court upon this Court because they are either unchallenged on appeal or because they are supported by any competent evidence, the trial court erred as a matter of law in its failure to indicate its consideration of the imputation of knowledge of StoneHunt's fraudulent actions to defendants in defendants' capacity as a co-

principal of StoneHunt in their joint real estate development venture and the resulting common law recognition of their principal-agent relationship wherein defendants are charged with the knowledge of StoneHunt which was acquired by StoneHunt in the course of defendants' business pursuits with StoneHunt. The facts, as found by the trial court, compel the imputation of knowledge to defendants of StoneHunt's fraudulent activities as StoneHunt knew these activities to be fraudulent at the time of their commission, consequently rendering the transfer of the subject property to defendants by StoneHunt to be voidable as to plaintiff and thus denying defendants' ability, under these facts and circumstances, to be a good faith purchaser for value of the subject property.

**D. Plaintiff's UDTPA Argument**

¶ 32      As a related issue, plaintiff argues that if the trial court is deemed to have erred, as we have concluded was the case here, in determining defendants' status as good faith purchasers for value, then the trial court must also be instructed on remand to enter judgment in favor of plaintiff as to its UDTPA claim against Midtown Area Partners II, LLC, because the trial court's dismissal of this claim was predicated on its erroneous good faith purchaser determination.  Plaintiff offers the bare assertion, without citation to controlling statutory or case law, that defendants' violation of the UVTA alone "constitutes a violation of the UDTPA as a matter of law." Plaintiff invokes several cases from this Court and the Court of Appeals which have

tended to hold that violations of other fraud-related statutes also constitute violations of the UDTPA. See, e.g., *Stanley v. Martin*, 339 N.C. 717, 723–25 (1995); *Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 97–99 (1985).

¶ 33        Plaintiff's argument regarding this issue was not argued before, nor considered by, the Court of Appeals, and there is no decision from the lower appellate forum concerning the trial court's dismissal of plaintiff's UDTPA claim which was lodged against defendant Midtown Area Partners II, LLC when plaintiff amended its complaint against that party as a matter of right.[6] The argument was not referenced in plaintiff's petition for discretionary review, and thus was not considered in this Court's allowance of plaintiff's request for this Court to afford discretionary review of the Court of Appeals decision. Rule 16(a) of the North Carolina Rules of Appellate Procedure states that, when reviewing a decision of the Court of Appeals "whether by appeal of right or by discretionary review," our task is limited to determining "whether there is error of law *in the decision of the Court of Appeals*." N.C. R. App. P. 16(a) (emphasis added). Unless a party asserts the right to appeal by virtue of the presence of a dissenting opinion within the Court of Appeals' decision in a case, our

---

[6] The Court of Appeals did, however, hold that the trial court did not abuse its discretion in denying plaintiff's motion to amend its complaint against defendant Midtown Area Partners Holdings, LLC because that issue was properly briefed and argued before the Court of Appeals. Plaintiff expressly waived any argument concerning this issue on discretionary review before this Court, and the Court of Appeals opinion on the issue of the trial court's denial of plaintiff's motion to amend is therefore left undisturbed by this opinion.

review "is limited to consideration of the issues stated in . . . the petition for discretionary review and the response thereto . . . and properly presented in the new briefs." *Id.* We have held that "[i]n the absence of error so fundamental that we would invoke our Rule 2 [of the North Carolina Rules of Appellate Procedure] power to suspend the rules and consider defendant's assignment of error, we, too, are bound by the Rules of Appellate Procedure, and will not review matters not properly before us." *State v. Fennell*, 307 N.C. 258, 263 (1982). We hold that whether defendants' violation of the UVTA constitutes a per se violation of the UDTPA is not an issue that is properly before the Court, and plaintiff asserts no argument which requests our invocation of Rule 2. Furthermore, we decline to invoke the general supervisory powers of the Court in order to implement such a definitive determination as urged by plaintiff. We therefore do not address the merits of plaintiff's argument concerning this issue.

### III.   Conclusion

¶ 34        In light of the foregoing observations, the decision reached by the Court of Appeals in this case is reversed in part and remanded to the Court of Appeals for further remand to the trial court for additional proceedings not inconsistent with this Court's opinion.

REVERSED IN PART AND REMANDED.

Justice BERGER did not participate in the consideration or decision of this

case.

Justice BARRINGER concurring in part and dissenting in part.

¶ 35    This matter concerns a claim of invalid transfer of real property (Subject Property) between StoneHunt, LLC and Midtown Area Partners Holdings, LLC and Midtown Area Partners II, LLC (collectively MAP), alleged by The Cherry Community Organization (CCO). The Court of Appeals correctly held that the trial court's determination that MAP was a good faith purchaser of the Subject Property was a finding of fact that was supported by competent evidence. Therefore, this Court should affirm the decision of the Court of Appeals.

¶ 36    In reaching a contrary conclusion, the majority fails to consider the unique nature of the asset in dispute—real property—and neglects to contemplate the effect at the time of purchase of the trial court's previous cancellation of CCO's notice of lis pendens. A full consideration of the evidence before the trial court—including the trial court's consistent denial of CCO's claims to the title of the Subject Property, MAP's independent efforts to ensure that the Subject Property's title was unencumbered, and the fact that MAP paid a reasonably equivalent value for the Subject Property—dictates that this Court should affirm the decision of the Court of Appeals that upheld the trial court's judgment. Therefore, I respectfully dissent in part. I concur with the majority's holding that CCO's argument concerning its claim against MAP under the Unfair or Deceptive Trade Practices Act is not properly before

us and the majority's decision to decline to invoke the Court's general supervisory powers to reach the merits on this issue.

## I.  Background

¶ 37  In 2004, StoneHunt and CCO entered into a contract under which StoneHunt would purchase real property from CCO and provide some affordable housing on the real property conveyed. Thereafter, in 2005, StoneHunt purchased the real property, which included part of the Subject Property, from CCO. StoneHunt constructed a multi-story residential structure on one of the parcels purchased from CCO. In 2013, MAP approached StoneHunt to purchase the Subject Property, with the intention to add the land to a mixed-use development project. MAP and StoneHunt subsequently agreed to enter into a venture in which they would jointly pursue rezoning the Subject Property and another parcel owned by MAP. Accordingly, MAP and StoneHunt executed a zoning application in August 2014 for a mixed-use development covering the Subject Property. StoneHunt had already sold the remaining undeveloped real property purchased from CCO, except for the Subject Property, to another company. At the public hearing in April 2015 before the Charlotte City Council, two individuals spoke on behalf of CCO to voice their objections to the rezoning application. Ultimately, the rezoning was approved on 28 September 2015.

¶ 38  On 10 September 2015, CCO filed a complaint against StoneHunt alleging breach of contract and violation of the Unfair or Deceptive Trade Practices Act

(UDTPA) and seeking money damages, partial rescission of the contract and deed, and reconveyance of the Subject Property to CCO (Case No. 1). CCO also filed a notice of lis pendens with respect to the Subject Property.

¶ 39 On 26 May 2016, the trial court cancelled the notice of lis pendens after determining that pursuant to N.C.G.S. § 1-116(a)(1), CCO's allegations in the complaint for Case No. 1 did not affect title to the Subject Property (Cancellation Order). CCO appealed the Cancellation Order. While initially, the Court of Appeals temporarily stayed the Cancellation Order, the Court of Appeals later dissolved the stay on 16 June 2016. On 17 June 2016, CCO's counsel sent a letter to MAP's counsel informing MAP that although the notice of lis pendens had been cancelled by the trial court, CCO expected its claim to recover title to the Subject Property would be reinstated. Yet, on 4 April 2017, the Court of Appeals dismissed the appeal from the Cancellation Order, finding that the appeal was interlocutory and that CCO had not argued that the appeal affected a substantial right. *Cherry Cmty. Org. v. StoneHunt, LLC*, No. COA16-905, 2017 WL 1276077, at *3–4 (N.C. Ct. App. April 4, 2017).

¶ 40 MAP purchased the Subject Property from StoneHunt on 2 February 2017. Before the purchase, MAP had confirmed that the trial court had ruled that CCO's Case No. 1 had not affected the title to the Subject Property, that the trial court had cancelled the notice of lis pendens, and that there was currently no lis pendens filed with respect to the Subject Property. MAP paid StoneHunt $200,000 in cash and

executed a promissory note in the amount of $900,000 due and payable on 2 February 2018.

¶ 41  On 30 August 2017, CCO filed a complaint against StoneHunt and MAP, asserting claims under the North Carolina Uniform Voidable Transactions Act (UVTA) pursuant to N.C.G.S. § 39-23.5, alleging that StoneHunt had engaged in a fraudulent transfer and that MAP was not a good faith purchaser and did not pay a reasonably equivalent value for the Subject Property (Case No. 2). CCO further moved for a preliminary injunction either enjoining MAP from paying $900,000 to StoneHunt on 2 February 2018 or enjoining StoneHunt and its principal from disposing of any payments related to the transfer of the Subject Property or other assets, or both. CCO also filed a notice of lis pendens relating to Case No. 2. On 9 February 2018, the trial court denied plaintiff's motion for a preliminary injunction.

¶ 42  In Case No. 1, the jury returned a verdict in July 2018 in favor of CCO, finding that StoneHunt breached the 2004 contract and finding facts supporting CCO's UDTPA claim. StoneHunt subsequently filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code, and CCO and StoneHunt consented to a judgment in the amounts of $4,934,247, $591,929, $25,000, and $1,488,682, which respectively reflect the trebling of actual damages found by the jury, interest, costs, and attorneys' fees.

¶ 43        Beginning 18 July 2018, a bench trial was conducted on Case No. 2 by the same judge who had presided over Case No. 1 since 2017. On 31 December 2018, the trial court entered a judgment in Case No. 2. The trial court found that CCO had met its burden of proof to show that StoneHunt intended to hinder, delay, or defraud CCO when it conveyed the Subject Property to MAP. *See* N.C.G.S. § 39-23.4(a)(1) (2021) ("A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .[w]ith intent to hinder, delay, or defraud any creditor of the debtor . . . ."). However, the trial court found that MAP met its burden of proof to show that it was a good faith purchaser of the Subject Property and paid a reasonably equivalent value for the property. The trial court noted that "[m]ere knowledge of a claim by a creditor that does not affect title does not preclude MAP from being a good faith purchaser." As a result, the trial court found that the transfer of the Subject Property was not voidable pursuant to N.C.G.S. § 39-23.8(a). *See* N.C.G.S. § 39-23.8(a) (2021) ("A transfer or obligation is not voidable under [N.C.]G.S. [§] 39-23.4(a)(1) against a person that took in good faith and for a reasonably equivalent value given the debtor or against any subsequent transferee or obligee."). Therefore, the trial court adjudged that CCO should recover nothing against MAP, dismissed CCO's claim against MAP with prejudice, and decreed the notice of lis pendens void.

Plaintiff appealed. On appeal, CCO argued that the trial court erred when it concluded MAP was a good faith purchaser of the Subject Property. The Court of Appeals disagreed and affirmed the trial court's judgment in Case No. 2.

After appealing Case No. 2, CCO also filed an appeal from the Cancellation Order entered in Case No. 1. However, CCO withdrew its appeal from the Cancellation Order on 28 January 2020.

## II.     Standard of Review

In a bench trial in which the trial court sits without a jury, the standard of review is whether competent evidence supported the trial court's findings of fact and whether those findings support its conclusions of law. *Lumbee River Elec. Membership Corp. v. City of Fayetteville,* 309 N.C. 726, 741–42 (1983). In reviewing the trial court's findings of fact, "[t]he findings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if . . . there is evidence to the contrary." *Id.* at 741. A trial court's judgment "must be granted the same deference as a jury verdict." *Id.*

## III.     Analysis

Under the UVTA, "[a] transfer [of property] is not voidable under [N.C.]G.S. [§] 39-23.4(a)(1) against a person that took in good faith and for a reasonably equivalent value." N.C.G.S. 39-23.8(a). The transferee has the burden of proving that

it took the property in good faith and that it paid reasonably equivalent value for the property by a preponderance of the evidence. N.C.G.S. § 39-23.8(g)(1), (h).

¶ 48        As previously noted, the trial court determined that "MAP ha[d] established and met its burden of proof to show that it was a good faith purchaser of the Subject Property and that it paid reasonably equivalent value for the Subject Property." Since "[w]hether a party has acted in good faith is a question of fact for the trier of fact," *Bledsole v. Johnson*, 357 N.C. 133, 138 (2003), the Court of Appeals properly treated this determination as a finding of fact. *Cherry Cmty. Org. v. Sellars*, No. COA19-695, 2020 WL 774020, at \*4 (N.C. Ct. App. Feb. 18, 2020) (unpublished opinion); *see also Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 499 (1992) ("The question of 'good faith' is one of fact to be resolved by the jury . . . ."). Therefore, this Court's task is to determine whether the finding of MAP's good faith is supported by competent evidence.

¶ 49        While good faith is not defined in N.C.G.S. § 39-23.8, this Court has recognized in other contexts that good faith "is an equitable concept premised on honest belief and fair dealing with another." *Bledsole*, 357 N.C. at 140. Determining a party's good faith requires consideration of "the circumstances and context in which the party acted." *Id.* at 138.

¶ 50        Regarding the circumstances and context of this case, it is noteworthy that it involves a real property transaction. In real property transactions, our law has

consistently recognized that "a sale or mortgage for a valuable consideration may be upheld as valid, though the seller or mortgagor intended by the transaction to delay or defraud his creditors, where it is not shown that the purchaser or mortgagee participated in the fraudulent purpose." *Henry W. Wolfe & Co. v. Arthur*, 118 N.C. 890, 899 (1896).[1] Nonetheless, a showing of actual knowledge and involvement is not required when the transferee had "notice of such facts as would induce any prudent man to institute and prosecute inquiries that *would have led to the discovery by them of the covinous purpose* of [the transferor]." *Id.* at 898–99 (emphasis added).

¶ 51        Further, because this is a real estate transaction, the doctrine of lis pendens applies. Under "[t]he firmly-established doctrine of lis pendens[,] . . . '[w]hen a person buys property pending an action of which he has notice, actual or presumed*, in which the title to it is in issue*, from one of the parties to the action, he is bound by the judgment in the action, just as the party from whom he bought would have been.' " *Hill v. Pinelawn Mem'l Park, Inc.*, 304 N.C. 159, 163–64 (1981) (original emphasis omitted and emphasis added) (quoting *Rollins v. Henry*, 78 N.C. 342, 351 (1878)). Likewise, "[t]he lis pendens statutes enable a purchaser for a valuable consideration who has no actual notice of the pendency of litigation affecting the title to the land to

---

[1] *Wolfe* is spelled "Wolfe" in the text of the North Carolina Reports but is listed as "Wolf" on Westlaw and in the "Cases Reported" portion of Volume 118 of the North Carolina Reports. The page numbers in the Supreme Court reporter are misnumbered. The page numbering skips from 891 directly to 898.

proceed with assurance when the lis pendens docket does not disclose a cross-indexed notice disclosing the pendency of such an action." *Lawing v. Jaynes*, 285 N.C. 418, 432 (1974) (original emphasis omitted); *see also Lis Pendens*, Black's Law Dictionary (11th ed. 2019) (stating the purpose of a notice of lis pendens as "to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome"). Thus, a lis pendens provides "record notice[ ] upon the absence of which a prospective innocent purchaser may rely." *Whitehurst v. Abbott*, 225 N.C. 1, 5 (1945).

¶ 52        In this matter, the trial court found that prior to purchase, MAP had confirmed that the trial court had ruled that CCO's Case No. 1 had not affected the title of the Subject Property and had cancelled the lis pendens, that there was currently no lis pendens, that MAP's attorneys conducted a title search, and that MAP obtained a commitment from a title insurance company to insure the Subject Property's title as free and clear without any exception for any notice of lis pendens. MAP had also sought to purchase the property since 2013, long before any litigation by CCO. These facts are not in dispute, and on this basis, MAP argues it could not have acted in bad faith. These findings, which are supported by competent evidence, do support the finding of good faith. While the letter sent to MAP by CCO's attorney gave MAP actual notice of CCO's pending contract action against StoneHunt, the notice of lis pendens had already been cancelled by the trial court, indicating CCO had *no valid*

*claim to the Subject Property's title*. Further, the property had been recently re-zoned by the Charlotte City Council. Had there been a cloud on the title, the rezoning would not have occurred. As found by the trial court, "[m]ere knowledge of a claim by a creditor that does not affect title does not preclude MAP from being a good faith purchaser." *See Hill*, 304 N.C. at 165 ("While actual notice of another unrecorded conveyance does not preclude the status of innocent purchaser for value, actual notice of pending litigation *affecting title to the property* does preclude such status." (emphasis added)).

¶ 53        Moreover, no reinstatement of the lis pendens ever occurred. The Court of Appeals dissolved the temporary stay of the Cancellation Order. CCO's subsequent appeal to the Court of Appeals with respect to the Cancellation Order was then dismissed as interlocutory, because CCO failed to "address in its brief any substantial right which would be jeopardized." *StoneHunt,* 2017 WL 1276077, at *3 (cleaned up). After entry of final judgment in Case No. 1, CCO appealed the trial court's Cancellation Order again. However, CCO moved to withdraw this appeal on 17 January 2020, and the Court of Appeals allowed the withdrawal on 28 January 2020. Thus, CCO abandoned its right to contend that Case No. 1 affected the Subject Property's title.

¶ 54        Further, MAP's payment of more than a reasonably equivalent value for the Subject Property is additional competent evidence of MAP's good faith. After hearing

testimony and considering appraisals by multiple witnesses, the trial court accepted the estimated value of the Subject Property as approximately $664,000. MAP, however, paid $1,100,000 for the Subject Property.

¶ 55        Therefore, the evidence put forth at trial was competent to support the trial court's finding that MAP was a good faith purchaser. Most notably: MAP was on notice that CCO had no valid claims to the title of the Subject Property since the notice of lis pendens was cancelled, and that remains the law of this case. Furthermore, MAP conducted an independent investigation to ensure that the Subject Property's title was unencumbered, and MAP paid more than a reasonably equivalent value for the Subject Property. While ultimately CCO was left without a solvent entity from which to collect its judgment against StoneHunt in Case No. 1, subsection 39-23.8(a) provides MAP a complete defense to avoidance of StoneHunt's fraudulent transfer and such defense is assessed at the time of transfer. N.C.G.S. § 39-23.8, official cmt. (2014). Both precedent and the statutory enactments of our legislature compel that we leave this determination to the fact-finder. Accordingly, we should adhere today to our role as an appellate court and decline to usurp the authority of the trial court by reweighing the evidence in this matter, even if our sympathies would encourage us to do otherwise. We should also recognize that to do otherwise would render real property purchasers subject to the will of an appellate court to determine issues better suited for a fact-finder and would undermine the

certainty and predictability necessary to protect good faith purchasers of real property, lenders, and insurers of real property title.

Chief Justice NEWBY joins in this concurring in part and dissenting in part opinion.